UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| RUSSELL TROWBRIDGE,<br><br>    Plaintiff,<br><br>    v.<br><br>NALCO COMPANY,<br><br>    Defendant. | Case No. C08-5137RJB<br><br>ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

This matter comes before the Court on the Defendant's Motion for Summary Judgment. Dkt. 33. The Court has considered the pleadings filed favoring and opposing the motion and the remainder of the file herein.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    FACTS

Plaintiff Russell Trowbridge was hired as a Customer Delivery Specialist ("CDS") for Defendant Nalco Company at its Vancouver, Washington facility on August 11, 2003. Dkt. 34, at 3. Defendant manufactures and delivers chemicals nationwide for water treatment and industrial applications. Dkt. 34, at 1. A CDS delivers chemicals by truck to customer sites, and receives extensive training to make sure that they perform their duties safely. Dkt. 34, at 1-2. Due to their repeated contact with customers, the Defendant places great emphasis on a CDS's customer relation skills. *Id.,* Dkt. 35-2, at 9-10.

U.S. Department of Transportation "DOT" regulations require that CDS's keep daily logs of all of their on-duty time. Dkt. 34, at 3. Parties agree that DOT regulations allow drivers to work only 60 hours

a week. According to Defendant, Plaintiff's daily logs show that he was compensated for all of the hours he claimed to work, including hundreds of hours of overtime. *Id.*

Kim Bohne is Defendant's Manager of Delivery Systems, and is in charge of the company's CDS's. *Id.* Brett Misener is Defendant's Vancouver, Washington plant manager. Dkt. 40-2, at 6. Richard Merriam is the lead CDS at the Vancouver plant, directs the other CDS's work, but does not have the authority to hire or fire anyone. Dkt. 34, at 2.

For the first six months after he was hired, Plaintiff was in a routine probationary period. Dkt. 34, at 3. Plaintiff was assigned the "East" run, which was comprised of Eastern Washington, Eastern Oregon, Idaho and Western Montana. Dkt. 35-2, at 16. He typically worked Monday through Friday, leaving the plant on Monday and returning on Thursday. Dkt. 35-2, at 16-18.

Plaintiff states that in September of 2003, Lead CDS Merriman first told him of "what was involved with the appearance of the trucks in Vancouver." Dkt. 35-2, at 13. Plaintiff states that he was expected to work "off the clock" to maintain his truck's appearance. Dkt. 35-2, at 52. This unpaid time included cleaning the truck, polishing the chrome, maintaining the truck, and loading and unloading the truck. Dkt. 35-2, at 52. Plaintiff claims that Lead CDS Merriman told him that "if we ran out of time, that DOT allowed us to volunteer to work on our trucks off the clock." Dkt. 35-2, at 13. Plaintiff admits that at that time, he was not told that he had to wash his truck "off the clock." Dkt. 35-2, at 14. Plaintiff states that he "questioned" this, and Lead CDS Merriman reasserted in October 2003, that DOT allowed drivers to clean their trucks "off the clock." Dkt. 35-2, at 22-23. Plaintiff states that Mr. Merriam was of the opinion that "if we couldn't get our work done and polish our trucks to a high degree, we were required to volunteer and get the job done. If that takes 70 hours, ten of it volunteer, then so be it." Dkt. 57-2, at 50. Plaintiff states that Lead CDS Merriman reasserted his belief on several occasions. Dkt. 35-2, at 30-34.

Plaintiff states that in late fall of 2003, Lead CDS Merriman called Plaintiff "Rosco P. Coltrane." Dkt. 35-2, at 24-26. Plaintiff complained to Plant Manager Brett Misener that, "ever since [he'd] talk about people working off the clock, and [he] didn't think that it was legal, now all of the sudden [he's] a Rosco P. Coltrane." Dkt. 35-2, at 27. Plaintiff states that he "did not recall" if Plant Manager Misene

told him that he had to "work off the clock." Dkt. 35-2, at 29. He does recall mentioning the issue to Mr. Misener on another occasion in 2004. Dkt. 35-2, at 38-40.

Plaintiff acknowledges that he was involved in three incidents before December of 2003, each regarding small spills(one of one ounce of product), and each was held to be "non-preventable." Dkt. 52, at 5-6. It is undisputed that on December 23, 2003, Plaintiff hit a pole with his truck at a customer site. Dkt. 35-2, at 67. This incident was found to be "preventable," (Plaintiff's fault) and at his deposition, Plaintiff stated that he did not disagree with that finding. Dkt. 35-2, at 67-9. Conversely, in Plaintiff's Declaration he attributes this "preventable" finding to retaliation. Dkt.52, at 6. In any event, as a result of the December 23, 2003, incident involving a pole, on January 21, 2004, Plaintiff's probationary period was extended to July 21, 2004. Dkt. 34-3, at 2.

Plaintiff received three citations at roadside inspections for violations of DOT regulations during the first six months of 2004. Dkt. 34-4, at 2-6. Additionally, he was found to have committed an "Hours of Service" violation by continuing to drive his truck after being on duty for 60 hours in a week in March of 2004. Dkt. 34-4, at 7.

Plaintiff notes that Rich Burdett, another CDS, prepared two evaluations of him, which were placed in his personnel file. Dkt. 52, at 7. The evaluations were based on "ride alongs," and were done in February and March of 2004. Dkt. 52, at 7.

In May of 2004, Plant Manager Misener sent an email to Plaintiff and other of Defendant's employees, praising Plaintiff for his diligence in maintaining his equipment. Dkt. 52-3, at 6.

At the end of his probationary period, in August of 2004, Plaintiff was given a raise from $17.61 to $18.47 per hour. Dkt. 34, at 4.

Plaintiff states that he kept a log of the hours that he worked off the clock until August of 2004. Dkt. 35-2, at 47-49. Plaintiff states that though he continued to work off the clock after August of 2004, he did not document the time. Dkt. 35-2, at 47-49. Plaintiff states that the amount of time that he worked off the clock varied depending on a variety of factors, including the weather. Dkt. 35-2, at 47-49. Plaintiff acknowledges that there were weeks that he worked more than 60 hours and was paid for that time. Dkt. 35-2, at 65-66.

On December 28, 2004, Plaintiff was cited at a roadside inspection for operating his truck in excess of the declared weight. Dkt. 34-7, at 2. Defendant placed an Incident Report in Plaintiff's personnel file. Dkt. 34-7, at 2. On January 11, 2005, the decision was made to hold an incident Review Board meeting. Dkt. 59, at 2.

On or about January 14, 2005, Plaintiff spoke with Manager of Delivery Systems Bohne about the issue of working "off the clock" to clean his truck. Dkts. 34, at 4, and 35-2, at 40. Plaintiff states Mr. Bohne told him to "forget about what's happened in the past and keep your mouth shut." Dkt. 57-2, at 57

The Incident Review Board meeting was held on March 4, 2005, regarding the citation Plaintiff received in late December 2004 for operating his truck in excess of the declared weight. Dkt. 34-8, at 2. The board noted that the incident was "preventable" as they felt that it was the "CDS's responsibility to ensure that all of their vehicle documents are correct." Dkt. 34-8, at 2. They did decide that in this case only, Plaintiff should be reimbursed for the fine assessed, as the "vehicle had been incorrectly registered, and that the registration had passed through several Nalco employee's hands." Dkt. 34-8, at 2. Plaintiff states that despite the fact that he was reimbursed for the fine, he "found the process and being called out for criticism in front of other drivers for something beyond [his] control to be humiliating and demoralizing." Dkt. 52, at 8.

In March of 2005 Plaintiff received another raise from $18.47 to $19.02 per hour. Dkt. 34, at 5.

At the end of April 2005, Plaintiff told Richard White, of The Spokesman Review, one of Defendant's customers, about his feeling like he was forced by Defendant to work "off the clock" and about the name calling that went on at the Vancouver plant. Dkt. 57-2, at 60-61. Mr. White called Defendant's sales representative, John Deines, and reported what Mr. White found to be "unprofessional" behavior on Plaintiff's part. Dkt. 35-5, at 7. Mr. Deines reported the incident to his supervisor, Michael Lesniak, and together they called Lead CDS Merriam. Dkt. 36, at 2. Mr. Lesniak also sent a letter to Plant Manager Misener about the incident. Dkt. 35-3, at 11-12.

On April 25, 2005, Spokane District Manager Jeff McCauley sent a letter to Lead CDS Merriam relating complaints made by two members of his team, Vicki Chamberlain and Diana Crabtree, both District Administrators, about negative comments made by Plaintiff. Dkt. 34-10, at 2. Plant Manager Misener was also given a copy of the letter. Dkt. 35-3, at 12.

On April 29, 2005, Plant Manager Misener received the letter from Michael Lesnick, informing him of Plaintiff's complaints to Defendant's customer at The Spokesman Review. Dkt. 35-3, at 11-12. Plant Manager Misener states that, at that point, he recommended Plaintiff be suspended so that he not have further contact with customers. Dkt. 35-3, at 13. After he came back from his run, Plaintiff was suspended on that same day, April 29, 2005. Dkt. 52, at 9.

According to Defendant, Manager of Delivery Systems Bohne decided to terminate Plaintiff's employment with Defendant, effective Thursday, May 5, 2005, because of the complaint from Richard White, of The Spokesman Review, that Plaintiff was behaving unprofessionally and bad mouthing the company. Dkt. 34, at 6.

Plaintiff acknowledges that he has not sought medical or psychiatric help as a result of Defendant's treatment of him. Dkt. 35-2, at 96-97.

### B. CLAIMS MADE IN THE COMPLAINT

On March 6, 2008, Plaintiff filed this diversity case alleging that Defendant violated his rights under the Washington Minimum Wage Act statutes RCW 49.46 *et seq*., 49.52 *et seq*. and RCW 49.48 *et seq.* Dkt. 1. Plaintiff also makes claims under Washington common law for wrongful discharge in violation of public policy, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligent hiring, retention and supervision. *Id.*

### C. PENDING MOTIONS

Defendant now moves for summary dismissal of Plaintiff's claims pursuant to Fed. R. Civ. P. 56, arguing: 1) his wage claims are mostly time-barred, and the portions that are not are unsupported by evidence, 2) the evidence does not establish a claim of wrongful discharge in violation of public policy, and 3) Plaintiff's claims of outrage, negligent infliction of emotional distress, and negligent hiring, retention and supervision should be dismissed. Dkt. 33.

Plaintiff files a response, arguing: 1) a reasonable jury could find that Plaintiff established a claims of wrongful discharge in violation of public policy, and 2) Defendant's negligent conduct inflicted emotional distress on Plaintiff. Dkt. 51.

Defendant replies, arguing: 1) Plaintiff does not oppose dismissal of his wage claims, 2) Plaintiff's wrongful discharge claim should be dismissed, because his complaint to a customer was not protected

activity and was a legitimate reason for termination, 3) Plaintiff's arguments over past performance and other incidents, including the treatment of others, are irrelevant to his wrongful discharge claim, 4) Plaintiff cannot establish a causal connection between his complaints to management and his termination, 5) Defendant had an overriding justification for Plaintiff's termination, 6) Plaintiff's negligent infliction claim should be dismissed, and 7) he has not opposed dismissal of his remaining claims. Dkt. 58.

Plaintiff files a surreply, in which he argues: 1) contrary to Defendant's assertion, Plaintiff repeatedly disputed Defendant's reason for terminating him, 2) the statute of limitation does not bar evidence of Defendant's retaliatory motives, 3) Defendant misapprehends the tort of wrongful discharge in violation of public policy, 4) Plaintiff did not contradict his testimony, 5) Defendants' legal citation is misleading, and 6) Plaintiff opposes dismissal of his wage claims. Dkts. 64 and 67.

Defendant files an objection to the surreply arguing that it does not ask to strike any evidence cited in the Reply, and so is not authorized by local Fed. R. Civ. P. 7(g). Dkt. 65. Defendant asks the Court to "disregard" the surreply. *Id.*

## II. DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the non moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."); *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*. Conclusory, non specific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

/

### B. WAGE CLAIMS UNDER RCW 49.46, 49.48, AND 49.52

The statute of limitations for claims under Washington's wage statutes are three years. *Seattle Prof. Engineers Employees Ass'n v. Boeing Co.,* 139 Wn.2d 824, 837 (2000); RCW 4.16.080(3). Plaintiff filed his case on March 6, 2008. Dkt. 1. To the extent Plaintiff makes unpaid wage claims under RCW 49.46, 49.48 or 49.52 for any date earlier than March 6, 2005, his claims should be dismissed with prejudice as time barred. In any event, Plaintiff concedes in his Surreply that he is "not seeking an award for unpaid off the clock wages." Dkt. 67, at 4. Accordingly, to the extent that Plaintiff makes claims under RCW 49.46, 49.48, or 49.52 for the dates between March 6, 2005, to May 5, 2005, or for "unpaid off the clock wages," Defendant's motion should be granted and Plaintiff's claims should be dismissed as he has indicated he will not continue with that claim.

Plaintiff argues that he can still recovery attorney's fees under RCW 49.48.030 for his termination in violation of public policy claim. Dkt. 67, at 4. RCW 49.48.030 provides,

> In any action in which any person is successful in recovering judgment for wages or salary owed to him, reasonable attorney's fees, in an amount to be determined by the court, shall be assessed against said employer or former employer: PROVIDED, HOWEVER, That this section shall not apply if the amount of recovery is less than or equal to the amount admitted by the employer to be owing for said wages or salary.

Indeed, Washington plaintiffs who succeed in wrongful discharge in violation of public policy claims and recover lost wages, are entitled to attorney's fees under RCW 49.48.030. *Brundridge v. Fluor Federal Services, Inc.,* 164 Wash.2d 432, 458 (2008). Plaintiff's claim for attorney's fees under RCW 49.48.030 is

dependent upon the success of his wrongful discharge in violation of public policy and retaliation claims and whether he recovers lost wages. Accordingly, Defendant's motion to summarily dismiss Plaintiff's claim for attorney's fees under RCW 49.48.030 should be denied without prejudice.

**C. WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY AND RETALIATION CLAIMS**

There are four elements to analyze for a claim of wrongful discharge in violation of public policy: (1) the existence of a clear public policy (the clarity element), (2) discouraging the conduct in which Plaintiff engaged would jeopardize the public policy (the jeopardy element), (3) the public-policy-linked conduct caused the dismissal (the causation element), and (4) there must not be an overriding justification for the dismissal (the absence of justification element). *Brundridge,* at 440; *Gardner v. Loomis Armored, Inc.,* 128 Wn.2d 931, 941 (1996).

To establish a retaliatory discharge claim, a Plaintiff must prove that: "(1) he or she engaged in statutorily protected opposition activity," (2) the protected activity caused the discharge, and (3) the employer did not have an "overriding justification" for the discharge. *Coville v. Cobrac Services, Inc.,* 73 Wn. App. 433, 439 (1994).

The first two elements in the *Gardner* test and the first element of the *Coville* test are similar here. The first two elements in the *Gardner* test are a result of the Washington Supreme Court's decision that a more "refined analysis" was required in a discharge in violation of public policy claim. *Sedlacek v. Hills,* 145 Wash.2d 379, 387 (2001). The last two elements of the two tests are also similar. Accordingly, this opinion will be structured after the test in *Gardner,* and will mention *Coville's* "protected activity" arguments raised where appropriate.

1. *Existence of a Clear Public Policy - Clarity Element*

To determine whether a clear public policy exists, Washington courts ask whether the policy is demonstrated in a constitutional, statutory or regulatory provision or scheme. *Danny v. Laidlaw Transit Services, Inc.,* 165 Wash.2d 200, 207-8 (2008)(*internal citations omitted*).

The Washington Legislature has generally "evidenced a strong policy in favor of payment of wages due employees by enacting a comprehensive scheme to ensure the payment of wages." *Seattle Professional Engineering Employees Ass'n v. Boeing,* 130 Wash.2d 824, 830 (2000). Under RCW

ORDER
Page - 8

49.46.100(2), it is a gross misdemeanor for an employer to discharge or discriminate against an employee who has made a complaint to his employer or to authorized personnel at the Department of Labor and Industries that he has not been paid wages in accordance with the Minimum Wage Act.

Here, Plaintiff alleges that Defendant fired him for complaining about being forced to work "off the clock," and that action violates a clear public policy. Dkt. 51. Based on the statutory language, there is a clear public policy prohibiting the discharge of an employee for making a complaint to their employer or to the Department of Labor and Industries that they have not been paid wages in accordance with the Minimum Wage Act. Although Plaintiff did not file a complaint with the Department of Labor and Industries, as recently as January of 2005, Plaintiff complained to one of Defendant's managers, Manager of Delivery Systems Bohne, that he was being forced to perform unpaid work. Dkts. 34, at 4, and 35-2, at 40. To the extent that Plaintiff bases his claim upon his reports to Defendant's managers, he has carried his burden under the "clarity" element of the *Gardner* test. Likewise, he has met the requirement that he engaged in "statutorily protected opposition activity," the first element under *Coville,* when he complained to his managers that he was being forced to work without pay.

Defendant argues that there is no clear public policy prohibiting the discharge of an employee for making such a complaint to the employer's customers or other co-workers. Dkts. 33 and 58. Plaintiff has failed to show a clear public policy prohibiting the termination of workers who complain to the employer's customers or other co-workers that they have not been adequately paid under the Minimum Wage Act. Plaintiff has not cited a single Washington case supporting his position which addressed employee complaints to co-workers or customers about the Minimum Wage Act. The claim of discharge in violation of public policy is to be construed as a narrow exception to Washington's general rule of employment at will. *Sedlacek v. Hills,* 145 Wash.2d 379, 385 (2001). The Washington Supreme Court has cautioned that the exception "should be applied cautiously in order to avoid allowing an exception to swallow the general rule." *Id.,* at 390. The Legislature specifically identified the parties to whom an employee could complain and be protected from discharge or discrimination. Plaintiff has failed to carry his burden on the "clarity" element under *Gardner* or the "statutorily protected opposition activity" element under *Coville* in regard to his complaints to co-workers or customers.

    2.    *Discouraging the Conduct in Which Plaintiff Engaged Would Jeopardize the*

*Public Policy - Jeopardy Element*

"To satisfy the 'jeopardy' element, a plaintiff must show that her or his conduct directly relates to the public policy, or was necessary for the effective enforcement of the public policy. This burden requires a plaintiff to argue that other means for promoting the policy are inadequate." *Brundridge,* at 440 (*internal citations omitted*).

Plaintiff has shown that his complaints made to Defendant's managers directly relate to a public policy. Plaintiff's discussions with his managers were the sort of protected conversations that the statute contemplated. RCW 49.46.100(2). Plaintiff has met the "jeopardy" element as far as his complaints to his managers are concerned.

On the other hand, Plaintiff has not shown that complaining to co-workers or to customers "directly relates to the public policy." *Brundridge,* at 440. Plaintiff has not shown that reporting Defendant's alleged failure to pay in accord with Washington's wage laws to coworkers or customers was "necessary for the effective enforcement of the public policy." *Brundridge,* at 440. This is true particularly in light of the fact that co-workers and customers generally do not have the power to set an employee's pay. Plaintiff offers no basis upon which to conclude that Washington's public policy favoring employees being appropriately compensated under the law is furthered by an employee complaining to co-workers or customers. Plaintiff has failed to make any showing that means other than complaining to co-workers or customers, the means found in RCW 49.46.100 for example, are inadequate to promote the public policy at hand. To the extent that Plaintiff bases his claim on his reports to co-workers, including Vicki Chamberlain and Diana Crabtree, or Richard White of The Spokesman Review (Defendant's customer), he has failed to meet the "jeopardy" element.

        3.    *Engaging in the Protected Behavior Caused the Dismissal - Causation Element*

Under the "causation" element, a plaintiff must show that the public policy-linked conduct actually caused termination of employment. *Gardner,* at 941. Discharge after "some length of time" after the employee's protected conduct "will be less likely to reflect an improper motive connected with that activity." *Wilmont v. Kaiser Aluminum and Chemical Corp.,* 118 Wash.2d 46, 69 (1991).

In the instant case, the most recent protected activity - complaining to a manager (Manager of Delivery Systems Bohne) that he was being forced to work unpaid - was on or around January 14, 2005. Dkts. 34, at 4, and 35-2, at 40. He was suspended on April 25, 2005. A little over three months had passed between Plaintiff's complaint to Bohne and his termination. Accordingly, the evidence of a causal link based upon temporal proximity is thin, particularly in light of Plaintiff's intervening unprotected behavior - complaining to a customer. However, for purposes of this motion alone, the Court will assume Plaintiff has carried his burden under the "causation" element. He has shown that there are issues of fact as to whether his complaints to Bohne on or around January 14, 2005, may have been part of the cause - a substantial factor - of his termination.

### 4. *Overriding Justification*

For the fourth element, the burden shifts to the employer to offer an overriding justification for the dismissal. *Brundridge,* at 440. Although the employer has the burden of production for this element, the ultimate burden of persuasion remains with the employee to show that the employer's justification was pretextual. *Id.,* n. 1.

Defendant argues that Plant Manager Misener and Manager of Delivery Systems Bohne decided to terminate Plaintiff's employment with Defendant, effective May 5, 2005, because of the complaint from customer Richard White, of The Spokesman Review, that Plaintiff was behaving unprofessionally and bad-mouthing the company. Dkt. 34, at 6. The record shows that Plaintiff was suspended within, at most, a few days of Plant Manager Misener's being told of Plaintiff's conversation with Mr. White. It appears from the record that when Plaintiff returned from his run, on Friday, April 29, 2005, he was suspended. He was officially terminated on May 5, 2005. Defendant here has met its burden and provided a legitimate motivation for the termination. *Wilmont,* at 69-70.

The burden now shifts back to Plaintiff to show that Defendant's proffered reason for his discharge - his complaints to Mr. White - was pretextual or by showing that although the employer's stated reason is legitimate, his complaints were nevertheless "a substantial factor motivating the employer to discharge the worker." *Wilmont,* at 69-70.

Plaintiff argues that Defendant's justification to dismiss him was pretextual because Defendant fired another employee for objecting to religious discrimination. Dkt. 51, at 4. Plaintiff fails to show the

relevance of this employee's situation in comparison to his situation. Plaintiff does not allege, nor is there any evidence in the record, that this other employee engaged in the key behavior here - complaining to a customer - as Plaintiff did.

Plaintiff further argues that each time he complained, Defendant retaliated against him by "nitpicking" his work and filing reports in his personnel file. Dkt. 51. Although Defendant's stated reason for firing him was legitimate, Plaintiff has provided sufficient evidence to show there are issues of fact as to whether his complaints to management were "a substantial factor motivating the employer to discharge" him. Reviewing the record for the entire span of Plaintiff's employment indicates that he began to object to working "off the clock" in the first few months of his employment, and did so, from time to time, with management until January of 2005. Dkt. 35-2, at 22-40; Dkt. 57-2, at 50. In fact, in the January 14, 2005, meeting between Plaintiff and Manager of Delivery Systems Bohne, regarding the issue of his working "off the clock," Plaintiff alleges that Mr. Bohne told him to "forget about what's happened in the past and keep your mouth shut." Dkt. 57-2, at 57. Plaintiff was not suspended/terminated until late April/early May of 2005 when he was discovered not to be "keeping his mouth shut."

Considering the record as a whole, Plaintiff has provided, although barely, sufficient evidence of material fact to show that his complaints to management could be found to have been "a substantial factor motivating" Defendant to discharge him.

5. *Conclusion on Plaintiff's Claims for Wrongful Discharge in Violation of Public Policy and Retaliation*

Defendant's motion to summarily dismiss Plaintiff's claims for wrongful discharge in violation of public policy and retaliation should be denied to the extent these claims are based upon Plaintiff's complaints to his managers. After sifting through all Plaintiff's rhetoric in the pleadings and examining the evidence in the record, the court finds that Plaintiff has carried his burden on these claims. Plaintiff's claims for wrongful discharge in violation of public policy and retaliation should not be dismissed.

### D. NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS CLAIM

A Washington plaintiff can recover for negligent infliction of emotional distress if he proves: (1) negligence, i.e., duty, breach, proximate cause, and injury; and (2) the additional requirement of objective

symptomatology. *Kloepfel v. Bokor*, 149 Wash.2d 192, 199 (2003); *Segaline v. State Department of Labor and Industries,* 144 Wash. App. 312, 327 (2008).

        1.    *Negligence*

Plaintiff does not met the first portion of the test for a negligent infliction of emotional distress claim - negligence. First, Plaintiff fails to articulate what duty is to be imposed upon Defendant as his employer. "There is no duty to for an employer to provide employees with a stress free work place. *Snyder v. Medical Service Corp. of Western Washington,* 145 Wash.2d 233, 243(2001). "Under established notions of negligence, a duty is owed to others only with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous. Conduct is unreasonably dangerous when its risks outweigh its utility." *Bishop v. State*, 77 Wash. App. 228, 234 (1995) (*internal citations omitted*). "The utility of permitting employers to handle workplace disputes outweighs the risk of harm to employees who may exhibit symptoms of emotional distress as a result." *Id.* "Absent a statutory or public policy mandate, employers do not owe employees a duty to use reasonable care to avoid the inadvertent infliction of emotional distress when responding to workplace disputes." *Id.,* at 235. Evening assuming that Defendant owed Plaintiff a duty, Plaintiff makes no showing on the remaining negligence elements.

        2.    *Objective Symptomatology*

Moreover, Plaintiff does not meet the second portion of the test - evidence of "objective symptomatology." For negligent infliction of emotional distress claims, a plaintiff must prove that they "have suffered emotional distress by objective symptomatology, and the emotional distress must be susceptible to medical diagnosis and proved through medical evidence." *Kloepfel*, at 197-98 (*internal citations omitted*). "The symptoms of emotional distress must also constitute a diagnosable emotional disorder." *Id.* at 198.

Plaintiff has not pointed to any medical evidence that "he has suffered emotional distress by objective symptomatology." *Kloepfel*, at 197-98. Plaintiff has not made any showing that his emotional distress is "susceptible to medical diagnosis." *Id.* Plaintiff has not shown that the symptoms of his emotional distress constitute a "diagnosable emotional disorder." *Id.*

Plaintiff argues that *Kloepfel* "applies only to intentional infliction of emotional distress claims, not to negligent infliction claims." Dkt. 67, at 4. Plaintiff misreads *Kloepfel*. The *Kloepfel* Court considered the question of whether claims for intentional infliction of emotional distress (outrage claims) require a showing of objective symptomatology as is required in claims for negligent infliction of emotional distress. After comparing the two claims, the Court determined that objective symptomatology is not required to establish intentional infliction of emotional distress. *Id.* at 633. It held, "[t]he general rule is firmly established that physical injury or bodily harm-'objective symptomology'-is not a prerequisite to recovery of damages where intentional (and, in most states, reckless) emotional harm has been inflicted." *Id.* It continued, "[m]any states, including this one, have distinguished negligent infliction of emotional distress from intentional infliction of emotional distress by making bodily harm or objective symptomatology a requirement of negligent but not intentional infliction of emotional distress." *Id.* at 633-34.

Defendant's motion for summary judgment on this claim should be granted. Plaintiff's claim for negligent infliction of emotional distress should be dismissed.

### E. OUTRAGE AND NEGLIGENT HIRING, RETENTION AND SUPERVISION CLAIMS

Plaintiff does not dispute dismissal of his outrage and negligent hiring, retention and supervision claims. Dkts. 51 and 67. Defendant's motion to summarily dismiss these claims should be granted.

### III. ORDER

Therefore, it is hereby **ORDERED** that:

- Defendant's Motion for Summary Judgment (Dkt. 33) is:

  - **DENIED AS TO THE FOLLOWING CLAIMS**: Wrongful discharge in violation of public policy and retaliation to the extent that these claims are based upon Plaintiff's complaints to Defendant's managers, and for attorney's fees under RCW 49.48.030, and

  - **GRANTED AS TO PLAINTIFF'S REMAINING CLAIMS**.

- Except for Plaintiff's claims for wrongful discharge in violation of public policy and retaliation to the extent that these claims are based upon Plaintiff's complaints to Defendant's managers and for

- attorney's fees under RCW 49.48.030, Plaintiff's remaining claims are **DISMISSED WITH PREJUDICE**.

The Clerk of the Court is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

DATED this 24th day of March, 2009.

*/s/ Robert J. Bryan*
ROBERT J. BRYAN
United States District Judge

ORDER
Page - 15